

*U. S. Department of Justice*

*United States Attorney*
*District of Maryland*

---

*Michael F. Davio*
*Special Assistant United States Attorney*
*Michael.Davio@usdoj.gov*

*Suite 400*
*36 S.Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4985*
*MAIN: 410-209-4800*

August 14, 2020

The Honorable Catherine C. Blake
United States District Judge
101 West Lombard Street
Baltimore, MD 21201

**FILED VIA ECF**

    Re:    *United States v. Jason Marquis Smith*,
            Criminal No. CCB-18-0399

Judge Blake:

    The Government writes this letter in advance of the Defendant's sentencing, scheduled for Wednesday, August 19, 2020. As set forth more fully below, the Government requests that Court sentence the Defendant to 36 months of incarceration, and that he be ordered to pay restitution not exceeding the agreed-upon amount of $1,124,113.[1]

    I.    Facts

    On January 16, 2020, the Defendant pleaded guilty to Counts One and Four of the Indictment, conspiracy to commit bank fraud, and bank fraud, in violation of 18 U.S.C. §§ 1349 and 1344, respectively, for his role in a scheme to purvey so-called "auto conversion loans."

    The Defendant is the most culpable and senior surviving member of a conspiracy instituted by S.F., now deceased, that operated between approximately August 2013 and November 2014, to fraudulently obtain auto loans from banks by creating the appearance that there had been the purchase of an automobile by a qualified borrower, when in fact, there had not been. To accomplish this, the Defendant and others would apply for loans using personal information provided to them by the borrowers, coupled with fraudulent documents including forged documents such as vehicle purchase invoices, vehicle inspection certificates, utility bills, and paystubs that inflated the borrower's income. The Defendant and others would keep a substantial portion of the proceeds and give the balance to the "borrower." The Defendant and others would recruit "borrowers" for these loans from among the clientele of their so-called

---

[1] Agents are in the process of tabulating payments made by all "borrowers" in the scheme, who are numerous. The Government anticipates providing a final restitution figure prior to the sentencing hearing.

credit improvement businesses. The scheme was responsible for the issuance of over $1.2 million in fraudulent loans involving over 35 transactions.

The operation was a fairly complicated one, relying on numerous fabricated documents for each transaction. S.F., and others acting at his behest instituted at least three fraudulent car dealerships, registered in the States of Maryland and Alabama, and opened bank accounts in their names through which to disburse the loan proceeds. It appears that the Defendant and S.F. rotated the dealerships they used so that banks would not become suspicious of any one dealership in particular.

Regarding the Defendant's relationship to the scheme, S.D., a close associate of S.F.'s stated, "If [S.F.] was the president of his company, then [the Defendant] was the vice president." In particular, the Defendant recruited borrowers to participate in the scheme, would "close" prospective borrowers that S.F. brought to him, would draft and submit the fraudulent auto loan applications on behalf of the borrowers he and others recruited, and drive borrowers to banks to retrieve loan checks. In these transactions, the Defendant or his associates would typically submit only one loan application per client, and typically to the same bank, Navy Federal Credit Union.

However, apparently unsatisfied with the relatively modest profits of S.F.'s comparatively measured approach, in or about July 2014, the Defendant effectively began to operate his own franchise of S.F.'s scheme, taking on his own clients, and promising big payouts through multiple loans. For example, in the case of borrower J.M., the Defendant promised to obtain $280,000 in the form of multiple fraudulent auto loans, personal loans, and lines of credit, and in fact applied for several loans on her behalf. The Defendant recruited these clients either through his business or through codefendant Robert Donaldson, with whom he had entered a client referral agreement. The Defendant handled most aspects of these transactions himself, but often consulted with S.F., and relied on S.F.'s fictitious auto dealerships for the disbursal of fraudulent loan proceeds.

The recklessness and flagrancy with which the Defendant abused the banking system— and his own clients— demonstrates clearly the Defendant's dishonest motives. For example, in the case of Waddy-Bey, the Defendant submitted or caused to be submitted loan applications to at least seven banks, five of which totaled over $210,000; the amounts of two of the loans are unknown. Many of these loans were not approved or failed to materialize when banks learned of the fraud, but the Defendant was nonetheless successful in obtaining and cashing two loan checks totaling approximately $87,000, of which Waddy-Bey received $60,000. The Defendant would later deceive Waddy-Bey into sending his share back to the Defendant (in structured amounts, to avoid bank reporting requirements) and codefendant Darrien Cook, who kept the proceeds for themselves, leaving Waddy-Bey liable for the loans, with none of the proceeds.

The scheme only came to an end when, in November 2014 codefendant Sylvester Redd, likely a client of the Defendant's[2], fraudulently obtained an auto loan using one of S.F.'s

---

[2] Apparently fraudulent tax returns and bank statements in Redd's name were found among numerous other identity and financial documents in the Defendant's office when local law enforcement executed a search seizure warrants in late 2014. Also, it is not likely that Redd was S.F.'s client, as S.F. was only known to use Navy Federal Credit Union for auto conversion loans.

dealerships at a small community bank, Destinations Credit Union. When the Defendant's referral partner Robert Donaldson attempted to process a loan for one of his clients, J.D., at the same bank the next day, bank personnel became suspicious, determined the supporting documents of both Redd's and J.D.'s applications to be both fraudulent and extremely similar, and notified police. Had this not occurred, the Defendant could have inflicted significantly more financial harm on banks and individuals.

Despite missteps, the Defendant nonetheless led a prolific career in fraud, and is attributed to more than a third of the total loss associated with the scheme. As detailed in the Stipulation of Facts appearing in Attachment A of the Plea Agreement, of the 35 transactions known to be associated with the scheme, the Defendant is known to have personally facilitated or brokered at least ten, totaling over $480,000[3], but was likely involved in more,[4] and kept at least $55,000 in loan proceeds.

II.     Guidelines Calculation

The sentencing guidelines are calculated, as agreed upon by the parties, as follows:

The base offense level for Count 1, conspiracy to commit bank fraud is 7. U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1).

There is a 14-level enhancement due to a loss of between $550,000 and $1,500,000. 2B1.1(b)(1)(H).[5]

There is a 4-level enhancement because the Defendant was an organizer or leader of a criminal activity that involved five or more participants. U.S.S.G § 3b1.1(a).

Both counts group. U.S.S.G. § 3D1.2(d).

There is a 2-level downward adjustment because the Defendant clearly accepted responsibility. U.S.S.G. § 3E1.1(a).

The Government will move for an additional 1-level downward adjustment due to the Defendant's timely notification of intent to plead guilty. U.S.S.G. § 3E1.1(b).

As a result, the Defendant's final adjusted offense level is **22**.

The defendant is in Criminal History Category I, and his Guidelines sentencing range would be 41 to 51 months.

---

[3] Though not expressly stated in the Stipulation of Facts, this is the approximate sum of all transactions described as attributable to the Defendant therein.

[4] Many unattributed transactions bear the hallmarks of those known to be executed by the Defendant, but cannot be confirmed to be those of the Defendant.

[5] The Defendant is liable for the reasonably foreseeable losses caused by the conspiracy, $1.2 million. U.S.S.G. § 1B1.3(a)(1)(B). Even if this were not the case, though the actual loss attributable to the Defendant individually is approximately $481,642, his intended loss is significantly greater—far exceeding the $550,000 threshold of U.S.S.G. § 2B1.1(b)(1)(H)—as evidenced by the large sums he promised to J.M. and Waddy-Bey, and the multiple loan applications he submitted in pursuit of those sums.

III.     Section 3553(a) Factors

The Government, in consideration of the Sentencing Guidelines and the factors set forth at 18 U.S.C. § 3553(a) believes that a sentence of 36 months of incarceration is sufficient, but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

The offense is very serious. The Defendant served as a lieutenant in a complicated conspiracy that defrauded banks of over $1.2 million. For nearly a year and half, it was effectively a full-time job that involved dozens of borrowers and fraudulent loans. The Defendant was involved with the inner workings of the scheme, recruiting borrowers, applying for fraudulent loans using personal information provided to him by the borrowers, and promptly driving borrowers to the banks to pick up their loan checks before the banks could detect the fraud and cancel them.

Apparently motivated by greed, the Defendant later embarked upon what was effectively his own franchise of S.F.'s scheme, recruiting at least two clients of his own and likely more, and even enlisting an associate to recruit additional clients for him. In this franchise, the Defendant sought to increase the scope of the fraud exponentially, and were it not for his overreach, would have inflicted even greater losses on an even greater number of financial institutions and individuals.

In addition to serving a vital role in the overall conspiracy, the Defendant personally defrauded banks of hundreds of thousands of dollars, and stole from his own client, who was attempting to return the loan proceeds to the banks, albeit out of self-interest.

The Government acknowledges that the Defendant was generally forthcoming about his conduct and spoke voluntarily with law enforcement. The Government also acknowledges that the Defendant's criminal history is relatively minor, and he apparently has not reoffended since the offense conduct ended approximately six years ago.

Nevertheless, the offense conduct is very serious, deliberate, and protracted. A sentence of 36 months is sufficient but not greater than necessary to effect the aims of 18 U.S.C. § 3553(a).

IV.     Conclusion

For all of the foregoing reasons, the Government respectfully requests that this Court sentence the Defendant to 36 months of incarceration and enter an order of restitution not exceeding $1,124,113.

                        Respectfully submitted,

                        Robert K. Hur
                        United States Attorney

By:     Michael F. Davio
      Special Assistant United States Attorney

cc:     David Williams, Esq., Counsel for Defendant
      Aaron Wonneman, U. S. Probation Officer